### EDWARD CHAPPELL CO. v. CHESAPEAKE & O. RY. CO. et al.

United States District Court
S. D. New York.
July 10, 1952.

Foley & Martin, New York City, Christopher E. Heckman, New York City, of counsel, for plaintiff.

White & Case, New York City, Horace L. Walker and Hewitt Biaett, Richmond, Va., of counsel, for Chesapeake & O. R. Co.

Conboy, Hewitt, O'Brien & Boardman, New York City, J. P. Fishwick and R. B. Claytor, New York City, of counsel, for Norfolk & W. R. Co.

CONGER, District Judge.

Motion by the plaintiff for a temporary injunction and motions by the defendants to dismiss the action on various grounds.

The complaint seeks a declaration of invalidity of the defendants' tariffs as they apply to plaintiff upon the ground that the schedule of charges in such tariffs violates Section 2 of the Interstate Commerce Act, 49 U.S.C.A. § 2, and also a permanent injunction against the imposition of such charges and a temporary injunction pending final determination.

The tariffs have been published and filed with the Commission pursuant to orders of the Commission dating back to 1937. The order of the Commission as a result of James McWilliams Blue Line, Inc. v. United States, D.C.S.D.N.Y., 100 F.Supp. 66, affirmed I. C. C. v. James McWilliams Blue Line, Inc., 342 U.S. 951, 72 S.Ct. 626, 96 L.Ed. 707, has no plain application to the plaintiff's situation, although the Blue Line case and this case have a great deal in common. Both concern shipment of coal by the same defendant railroads (the so-called Pocahontas Railroads) from mines in Virginia, West Virginia and Kentucky to Hampton Roads ports which coal is subsequently moved by ocean to New England ports and then to interior ports. It is the manner of transportation to "interior ports" that caused the controversy in both of these cases. The whole question has to do with proportional rates or trans-shipping rates as distinguished from local rates.

There are three methods of transportation of this coal from the mines: (a) by rail from the mines to Hampton Roads ports, then by ocean to New England ports and thence by rail to the ultimate destination (rail-ocean-rail coal); (b) by rail from the mines to Hampton Roads ports, thence by ocean to New England ports and thence by barge to interior ports (rail-ocean-barge coal); (c) by rail from the mines, thence by ocean to New England ports (rail-ocean coal).

Before the Blue Line case, the proportional rates were higher for rail-ocean barge coal than they were for rail-ocean rail coal.

Plaintiff in the Blue Line case contended that the rates so established were unlawful and in violation of the provisions of the Interstate Commerce Act. The three-judge court held that plaintiffs were correct. The effect was to do away with any difference in rates between the coal shipped by rail-ocean-rail and coal shipped by rail-ocean and barge.

Pursuant to said decision, the Interstate Commerce Commission entered the following order:

"*It is ordered,* That from mines in Virginia, West Virginia and Kentucky to the Hampton Roads ports, including Norfolk, Newport News, Lambert's Point, and Sewall's Point, Va., defendants shall cease and desist, on or before June 9, 1952, and thereafter abstain from continuing higher proportional rates, or making different refunds to shippers or consignees, on coal which has a subsequent movement by ocean to a New England port, thence by barge, than on coal which has a subsequent movement by ocean to a New England port, thence by rail to the same ultimate destination."

As I see it this decision of the Court and the order of the I. C. C. has nothing to do with plaintiff's situation. The rate for its category comes under another category, (c) rail-ocean.

From the affidavit interposed in this matter by plaintiff, it appears that it buys its coal from mines in the so-called Pocahontas regions in Virginia, West Virginia and Kentucky; that the coal is shipped by defendant railroads to Hampton Roads, Virginia, for loading aboard coastwise barges for carriage directly to plaintiff's wharf at Norwich, Connecticut (on the Thames River). See also paragraphs Fourth and Fifth of the complaint.

It should be borne in mind that plaintiffs in the Blue Line case first applied to the Interstate Commerce Commission and after being turned down, then started actions pursuant to the provisions of Title 28 U.S. C. §§ 2284 and 2321-2325.

 It might very well be that plaintiff has a just cause for complaint and that this rate it is paying is an illegal one, but I feel plaintiff has not taken the proper course to redress the alleged wrong.

 "Whenever a rate, rule, or practice is attacked as unreasonable or as unjustly discriminatory, there must be preliminary resort to the Commission." Great Northern R. Co. v. Merchant's Elevator Co., 1922, 259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943. This principle has been consistently applied in the cases and it has clear application to plaintiff's. See Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 1907, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553; Robinson v. Baltimore & O. R. Co., 1912, 222 U.S. 506, 32 S.Ct. 114, 56 L.Ed. 288, among others.

 Looking at this litigation from another angle, it may very well be held that the complaint in effect seeks to enjoin, annul and set aside outstanding orders of the Interstate Commerce Commission. In other words, the complaint involves a direct attack upon the Commission's orders because what is sought here is a judgment declaring unlawful, and enjoining these railroads from complying with, a tariff which has been published in accordance with the orders of the Commission. That being so, this Court has no jurisdiction of this action.

As the Court said in Lambert Run Coal Co. v. Baltimore and Ohio Railroad Co., 1922, 258 U.S. 377, 42 S.Ct. 349, 66 L.Ed. 671:

"The rule of the railroad here complained of was that prescribed by the Commission. To that rule the railroad was bound to conform unless relieved by the Commission or enjoined from complying with it by decree of a court having jurisdiction. By this suit such a decree was in effect sought. The appellate court was therefore correct in holding that in such a suit an injunction of the District Court could be granted only by three judges.

" * * * The fact that this was a suit to set aside an order of the Commission did not appear on the face of the bill; but it became apparent as soon as the motion to dismiss was filed. Jurisdiction cannot be effectively acquired by concealing for a time the facts which conclusively establish that it does not exist." 258 U.S. at pages 381, 382, 42 S.Ct. at pages 350, 351, 66 L.Ed. 671.

The plaintiff's motion is denied and the defendants' motions to dismiss are granted.

Settle order.