UNITED STATES

v.

KANSAS CITY SOUTHERN RY. CO.

Civ. A. No. 5254.

United States District Court
W. D. Missouri, W. D.

Oct. 5, 1953.

Motion for New Trial and to Set Aside Order Dismissing Complaint Denied Nov. 17, 1953.

---

6. Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413.

Sam M. Wear, U. S. Atty., David A. Thompson, Asst. U. S. Atty., Kansas City, Mo., G. H. Penstone, Regional Atty., Office of Solicitor, U. S. Dept. of Agriculture, Chicago, Ill., for plaintiff.

Richard S. Righter, William E. Davis, Kansas City, Mo., for defendant.

RIDGE, District Judge.

During the period from April 20, 1945, to August 2, 1946, Commodity Credit Corporation shipped on commercial bills of lading, via the lines of defendant, 5,519 carloads of wheat (totaling 10,100,965 bushels) from Kansas City, Mo.–Kan., to Port Arthur, Texas, for export. The plaintiff, through the C.C.C., paid the rates as legally published in applicable tariffs for said shipments. All of the grain moved through an elevator owned by the Port Arthur Canal and Dock Company, which prior to the transportation in question was under lease to defendant. April 15, 1945, defendant subleased said elevator to Houston Milling Company, Inc., for a term of one year. Said elevator remained under that or other subleases throughout the period of time here considered.

A tariff of defendant which plaintiff contends was applicable to the major portion of the above shipments is defendant's Tariff 10–R, I.C.C. No. 5054,

effective December 5, 1939. That tariff, as modified by various supplements and circulars, was continued in effect during the period of all the shipments involved. Item 210–B, in Supp. No. 11 thereto, effective February 15, 1942, provided, in part, as follows:

"Port Arthur, Texas, elevator charges, as shown in Items Nos. 110, 115 and 125 of K.C.S. Lines Circular No. 32–H, I.C.C. No. 5132, for the handling of export grain from cars through the elevator to shipside are included in rates."

Such provision only applied, however, to grain for export to points other than Mexican Gulf Ports, Central and South America, Cuba and Puerto Rico.

Item No. 110 of K.C.S. Lines Circular No. 32–H (Ex. G) referred to in Supp. No. 11, supra, covered cleaning and fanning charges of one-fourth cent per bushel; Item No. 115 covered turning charges of one-fourth cent per bushel; and, Item No. 125 covered elevation charges for handling export grain from cars to the elevator, thence to the vessel, including thirty days' free storage, of one cent per bushel at defendant's Port Arthur, Texas, elevator. As to the latter charge, the tariff provided that "export grain moving through Kansas City, Mo.–Kan., on through rates, or export grain moving from Kansas City, Mo.–Kan., on proportional rates, varying proportional rates, or balance of through rates on which the Kansas City Southern Railway secured entire line haul from Kansas City, Mo.–Kan., to Port Arthur, Texas, free-time allowance will be thirty days." It was also provided by Item 140 of that circular that insurance was included with the elevation charges provided in Item No. 125.

In connection with the transportation of the grain above, the C.C.C. never made any demand of defendant to perform any elevation and storage services at Port Arthur, Texas, as provided for in defendant's published tariffs, supra. Instead, it entered into its usual form of "Uniform Grain Storage Agreement" with the Houston Milling Company, Inc., and certain other elevator companies who from time to time were in possession, pursuant to sublease, of the elevator at Port Arthur, Texas, and paid said companies for performing the services necessarily required for the handling of the grain from cars through that elevator to shipside. It was at the instigation of the C.C.C. that said sublessees subleased said elevator from defendant, and entered into "Uniform Grain Storage Agreements" with it; all as a part of the storage and export program of the C.C.C. The Uniform Grain Storage Agreements C.C.C. entered into with such sublessees were substantially different as to services, rates and charges to be paid for handling its export grain through the elevator at Port Arthur, Texas, than those contained in defendant's tariffs which defendant published as being included within the applicable freight rate.

Plaintiff's theory of claim is alleged in alternative counts in the complaint. Under the first count, the claim as made is one for "overcharge", premised in the fact that defendant did not provide elevator service for cleaning, fanning and turning, in and out elevation from cars to ship, with free storage up to thirty days as to each shipment of grain involved, as defendant was required to do by its tariff. As a consequence, plaintiff asserts defendant "overcharged" C.C.C. for the shipments of said grain. Recovery for such overcharge is sought to the reasonable value of the elevator service C.C.C. was necessarily required to furnish and pay to move such export grain through the Port Arthur, Texas, elevator. The second count of the complaint is one for damages as for breach of contract resulting from defendant's failure to comply with its duly published tariffs under the above circumstances.

In resisting plaintiff's claims, defendant, along with other defensive matter questions our jurisdiction to entertain or determine the claims plaintiff here makes against it. The substance of the jurisdictional question so raised is that plaintiff's claims "constitute an attempt

to enforce collection of a rebate of a portion of a regularly and lawfully filed and published railroad tariff rate, and that this Court is without jurisdiction to hear or entertain or act upon, or allow the same" in light of the provisions of the Interstate Commerce Act, 49 U.S. C.A. § 1 et seq. Thus, a proposition essential to our jurisdiction is presented which must be resolved before we are called upon to travel through the labyrinthian issues presented by the merits of the instant claims.

■■ It is well settled that the right to maintain an action at common law to recover the excess of a freight charge, over the duly published or established rate of a carrier is not affected by any of the provisions of the Interstate Commerce Act. Macon D. & S. R. Co. v. General Reduction Co., 5 Cir., 44 F.2d 499, certiorari denied 283 U.S. 821, 51 S.Ct. 345, 75 L.Ed. 1436. Likewise, the common-law right to recover the difference between the amount of a reasonable charge and the amount of an exorbitant unpublished charge coercively exacted by a carrier still remains; Swift & Co. v. New York C. R. Co., 2 Cir., 16 F.2d 17; Cocke v. Morgan's L. & T. R. R. & S. S. Co., 5 Cir., 4 F.2d 961, certiorari granted 268 U.S. 685, 45 S.Ct. 639, 69 L.Ed. 1156, and rev. on other grounds, 273 U.S. 656, 47 S.Ct. 342, 71 L.Ed. 825; *but*, if the charges of an interstate carrier have been made in accordance with filed and published rates, as provided in the Interstate Commerce Act, supra, the common-law remedy for enforcement of such a right has been abrogated, and enforcement of a claim under such circumstances is dependent upon the injured party's first filing a timely complaint with the Interstate Commerce Commission and obtaining a finding by that body that the rate charged was unreasonable under the circumstances, and the amount such party was thereby overcharged. Cf. Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553; Robinson v. Baltimore & O. R. R., 222 U.S. 506, 32 S.Ct. 114, 56 L.Ed. 288; U.

S. v. I.C.C., 337 U.S. 426, 437, 69 S.Ct. 1410, 93 L.Ed. 1451; Goodbody v. Penn. R. Co., 6 Cir., 29 F.2d 67. In a common-law action for recovery of damages, or overcharge, as the consequence of a published rate exacted by an interstate carrier, the only question between a shipper and the carrier is what is, or was, the legal published rate for the shipment, and not what the rate should have been, Carson Lumber Co. v. St. L. & S. F. R. Co., D.C., 198 F. 311, affirmed 10 Cir., 209 F. 191, and, this is so where the alleged damage or overcharge is due to an alleged practice of the carrier. Cf. Northern Pac. Ry. Co. v. Solum, 247 U. S. 477, 38 S.Ct. 550, 62 L.Ed. 1221.

■ Under the Interstate Commerce Act, the legally published tariff of a carrier may not be avoided, enlarged, or varied by the shipper or the carrier by contract, express or implied, or by the tort of the carrier. Keogh v. Chicago & N. W. Ry. Co., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183. So long as a published tariff rate remains operative, it is binding upon the shipper and the carrier alike, and must be enforced by the courts in fixing the rights and liabilities of the parties, where overcharge or damages are claimed as a consequence of its exaction. Cf. Robinson v. Baltimore & Ohio R. R., 222 U.S. 506, 32 S.Ct. 114, 56 L.Ed. 288; Great Northern R. Co. v. O'Connor, 232 U.S. 508, 34 S.Ct. 380, 58 L.Ed. 703. Accordingly, neither the shipper nor carrier may depart from the duly filed and published tariff rates in effect at the time an interstate shipment is made, and an interstate carrier has both a right and an absolute duty to charge and recover such scheduled rates until they are changed in the manner provided by law, even though they may, under particular circumstances, be excessive, unreasonable and unlawful. Davis v. Krauss Bros. Lbr. Co., D.C., 25 F.2d 888; North Am. Co. v. St. L. & S. F. R. Co., D.C., 288 F. 612, reversed on other grounds Spiller v. St. Louis & S. F. R. Co., 8 Cir., 14 F.2d 284, certiorari granted 273 U.S. 680, 47 S.Ct. 111, 71 L.Ed. 837, affirmed in part and rev. in part

on other grounds, 274 U.S. 304, 47 S.Ct. 635, 71 L.Ed. 1060.

■ In the case at bar, the evidence establishes that defendant under certain tariffs duly filed and published with the Commission as required in Section 6(1) of the I.C. Act, 49 U.S.C.A. § 6 (1), exacted from the C.C.C. the precise amount of freight rates it was legally authorized to charge for the shipments of grain here involved. No contention is made by plaintiff that defendant exacted any sum in excess of the legally published rates for such shipments. Plaintiff's contention is that defendant having exacted the legal and lawful rate for the shipments failed to perform services in connection therewith which defendant said it would furnish and perform by its tariff. As a consequence, it is asserted that in connection with the transportation of its grain, C.C.C. rendered services which we presently assume defendant should have rendered, and plaintiff seeks reparation therefor. (We do not here intend a definite decision that defendant was obligated to furnish elevation service as to all such shipments. We do not reach the merits regarding that matter.) To sustain the claim so made, plaintiff in its briefs concedes that a material element of its right of recovery under both counts of the complaint is that it must establish that the charges paid by the C.C.C. to companies with which it entered into "Uniform Grain Storage Agreements" for elevator service at Port Arthur, Texas, were reasonable. The evidence is that the charges so paid by the C.C.C. to such companies were reasonable for the services performed by those companies at the request of the C.C.C., but, further evidence establishes that the charges so paid were somewhat in excess of those which defendant said it would furnish and assume charges for in its lawfully published tariff. As a consequence, to sustain plaintiff's claim of "overcharge" we would be compelled to determine the reasonable value of the services C.C.C. rendered in connection with the transportation of the grain in-

volved, and upon that determination being made award reparations accordingly to plaintiff from the legally published rate it paid defendant for transportation of the grain. Manifestly, such a determination would not be one regarding overcharges. "The term 'overcharges' as used in (the Interstate Commerce Act is) * * * deemed to mean charges for transportation services in excess of those applicable thereto under the tariffs lawfully on file with the commission." 49 U.S.C.A. § 16(3). Parenthesis and italics supplied. In light of the foregoing authorities and also the provisions of Section 15(13) of the I.C. Act, 49 U.S.C.A. § 15(13), we have no jurisdiction to make any such determination or award.

■ Plaintiff asserts that if we should hold that we do not have jurisdiction to award reparation or damages in the above respect, then this Court may award it damages under the second count of the complaint to the extent of the precise elevator services charges covered in defendant's published Circular No. 32–H, supra. There are two answers to that proposition: (1) There is no provision in any tariff published by defendant, and presently before the Court, which authorizes, permits or sanctions defendant to make any allowance, refund, or rebate in any sum to any shipper if defendant did not furnish elevation service in connection with export grain at Port Arthur, Texas; and (2) we cannot say that under the instant circumstances the amount of charges defendant published for elevation service at Port Arthur, Texas, in connection with other and different rates and transportation of grain than as here considered, would be "just and reasonable," and the proper measure of plaintiff's damages, if any. Absence of a tariff provision authorizing such an allowance or refund from a legally established rate "would be in the nature of special allowances not authorized by (defendant's) tariff. A court's adjudication of this question in this case would not uniformly benefit all shippers for

whom (defendants) have transported (grain). Whether or not such a refund would amount to a discrimination should be determined by studies such as those the Interstate Commerce Commission is especially empowered to make." Armour & Co. v. Alton R. Co., 312 U.S. 195, 201, 202, 61 S.Ct. 498, 502, 85 L. Ed. 771.

In seeking reparations for freight rates paid under similar circumstances in connection with dock service, under a published railroad tariff which provided that such dock service charges were included in the published freight rate, plaintiff heretofore commenced such a claim before the I.C.C. consonant with the provisions of Section 15(13), supra. See U. S. v. Aberdeen & Rockfish Railroad Co., I. C. C. No. 30939. See also U. S. v. I. C. C., 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451; Id., 91 U.S.App.D. C. 178, 198 F.2d 958. We believe that plaintiff followed the proper procedure in those instances to recover reparation for the reasonable value of such services, and should have pursued like procedure in the case at bar, before coming into this United States District Court.

Plaintiff's complaint is dismissed because this Court has no jurisdiction to entertain or adjudicate the claims therein asserted. It is so ordered.

### On Plaintiff's Motion for New Trial and to Set Aside Order Dismissing Complaint

On October 5, 1953, this Court entered an order dismissing plaintiff's amended complaint on the ground that it presented issues resting solely within the expertise of the Interstate Commerce Commission to determine. Plaintiff moves the Court at this time to set aside this order of dismissal and to either grant a new trial or, in the alternative, to hold judgment in abeyance pending the conclusion of appropriate proceedings before the aforementioned administrative agency.

As we have already thoroughly expressed our views on our present inability to proceed to an adjudication of the rights asserted, we find no merit in plaintiff's first request for a new trial. Plaintiff presents nothing new which in any way warrants re-examination of the convictions heretofore expressed. We, therefore, direct our attention to plaintiff's request that the instant proceeding be held in abeyance pending administrative action by the Interstate Commerce Commission.

On its face, plaintiff's amended complaint prays restitution of "overcharges" arising out of the shipment of large quantities of grain for export, transported from Kansas City, Mo.–Kan., to Port Arthur, Texas. In the alternative, but praying damages in an amount identical to those demanded in Count I, plaintiff states a claim essentially for breach of contract, alleged to have been committed by defendant's failure to provide specified services which it had agreed to perform by virtue of its uniform freight tariff.

As this Court endeavored to demonstrate in its earlier order dismissing the amended complaint, we are thereby confronted with an issue far wider in scope than mere restitution, overcharge, or breach. Actually, plaintiff asks us to determine the propriety of a tariff rate, the imposition and payment of which remained above and beyond the control of either litigant. Specifically, that presents an issue as to whether the tariff rate was "reasonable". As we stated in our earlier memorandum, and as the authorities cited therein bear witness, this underlying question is one beyond the competency of this Court to determine. Consequently, plaintiff's motion to hold judgment in abeyance must stand or fall, depending on whether, after a determination by the Interstate Commerce Commission on the question of reasonableness, any independent justiciable issue could properly be presented to the Court for adjudication under the instant pleadings. In this very connection, it was recently stated by the United States Supreme Court, in Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 1951, 341 U.S. 246, loc. cit. 253, 71 S.Ct. 692, loc. cit. 696, 95 L.Ed. 912:

"It is true that in some cases the Court has directed lower federal courts to stay their hands pending reference to an administrative body of a subsidiary question. (Citations.) *But in all those cases the plaintiff below concededly stated a federally cognizable cause of action, to which the referred issue was subsidiary.* In no instance have we directed a court to retain a case in which it could not determine a single one of its vital issues. *Here the issue of reasonableness of the charges is not one clearly severable from the issues of liability,* for the acts charged do not amount to fraud unless there has been an unreasonable charge." (Italics ours.)

In the instant case, regardless of the purported claims for breach and overcharge, such issues are obviously not severable from the question of reasonableness which, far from being subsidiary, permeates every legal facet of plaintiff's case. Although plaintiff alleges "overcharge", such issue is, in actuality, non-existent, since defendant was duty-bound to charge and plaintiff duty-bound to pay the exact amount involved, even though those rates may have been unreasonable or unlawful under the particular circumstances. Relief therefrom could only be had before the Interstate Commerce Commission. By the same token, as we stated in our order of October 5th, plaintiff cannot recover on Count II of its complaint the elevation service charges in defendant's published Circular No. 32–H, since there is no provision in defendant's tariff permitting allowance of any refund or rebate merely because the carrier fails to furnish some given service it has promised to perform. What may be the value of the elevation services a carrier does or does not render is, again, ultimately a question of reasonableness beyond the competency of a Federal District Court to determine.

█ In view of the foregoing, the instant action has been properly dismissed. Furthermore, in the absence of issues independent of the question of reasonableness, it would be inadvisable, if not improper, to hold judgment in abeyance pending determination of the administrative proceeding. Although our former order indicated a dismissal for want of jurisdiction, the conclusions there reached were not prompted by any belief that this Court is without jurisdiction over plaintiff's action. As our former memorandum indicates, our inquiry throughout was directed not to technical jurisdiction, but to power to adjudicate the subject-matter of this action. Admittedly, the difference is a close and sometimes a confusing legal refinement. But, as stated in the Montana-Dakota case, supra, 341 U.S. loc. cit. 249, 71 S.Ct. loc. cit. 694:

"As frequently happens where jurisdiction depends on subject matter, the question whether jurisdiction exists has been confused with the question whether the complaint states a cause of action."

Since, in the instant case, federal jurisdiction is present and dismissal is warranted, we deem it proper to note that such dismissal was not for want of jurisdiction, but because plaintiff fails to state a claim for which this Court, in view of its subject-matter, can grant relief. Such a dismissal is, of course, one without prejudice to the rights of either party.

Plaintiff's motion to set aside our earlier order of dismissal and to grant a new trial or, in the alternative, to hold judgment in abeyance pending the conclusion of appropriate administrative proceedings, is overruled.

It is so ordered.